IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

WILLIAM LYNN FOLEY,                        )
on his own behalf and as father            )
and next friend of A.F., a minor,          )
et al.,                                    )
                                           )
            Plaintiffs,                     )
      vs.                                   )          Case No. 1:09-cv-01147-RB-GBW
                                           )
CARLSBAD MUNICIPAL SCHOOLS,                 )
et al.,                                    )
                                           )
            Defendants.                     )

MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants the City of Carlsbad, Allen Sanchez and

Tony Cisneros' Motion for Summary Judgment and for Qualified Immunity (Doc. 82), filed October

14, 2011, and Eddy County Defendants' Motion for Summary Judgment (Doc. 84), filed October

27, 2011. Jurisdiction arises under 42 U.S.C. § 1983, 42 U.S.C. § 1988, and 28 U.S.C. § 1343. The

issues have been fully briefed and are ready for decision. Having considered the arguments and

submissions of counsel, relevant law, and being otherwise fully advised, the Court **GRANTS**

Defendants' motions.

I.      FACTUAL BACKGROUND

        On a motion for summary judgment, trial courts view the evidence and draw reasonable

inferences therefrom in favor of the non-moving party. *Fuerschbach v. Sw. Airlines Co.*, 439 F.3d

1197, 1207 (10th Cir. 2006). With this in mind, the following facts form the basis of Plaintiffs' First

Amended Complaint ("FAC") and are uncontested except where otherwise noted.

        On December 5, 2007, Defendant Officers Allen Sanchez and Daniel Vasquez of the

Carlsbad Police Department received a tip that an Alta Vista Middle School ("Alta Vista") student

had offered to sell drugs to another student at the school. (Doc. 90 ¶ A). The officers traveled to Alta Vista to investigate, and upon their arrival separately interviewed two students regarding the alleged dealings. (Doc. 90 ¶ B). The officers first met with student L.M., who admitted to selling ten dollars worth of marijuana to fellow student E.M. (Doc. 84-3 Exh. 3 at 3[1]). L.M. stated he had received the marijuana from A.F. – a classmate and the then-minor student at issue in this case – and that he believed A.F. had obtained the drug from her older brother, later identified as Plaintiff Uriah Foley. (Id.) The officers next interviewed E.M. E.M. confirmed that he had purchased marijuana from L.M. that morning, and further admitted to having bought marijuana from L.M. multiple times over a period of several months. (Id.) He also stated he knew L.M. was buying the marijuana from A.F., and that he believed A.F. obtained the marijuana from her older brother. (Id.) Based on these statements, school principal Patricio Lujan summoned A.F. to his office for questioning by the officers. (Doc. 92 ¶¶ 1-3, 6). At the outset of the questioning, Officer Sanchez informed A.F. she was not under arrest and advised her of her Juvenile Miranda Rights. (Doc. 92 ¶ 7). He specifically advised her of her right to remain silent, that any statement she made could be used as evidence against her, of her right to have an attorney and parent present during questioning, and of her right to stop answering questions at any time until a parent or lawyer was present. (Doc. 92 ¶ 7). A.F. indicated to the officers that she understood these rights. (Doc. 92 ¶ 8).

In the course of the interview, A.F. stated that on more than one occasion, she had received marijuana from her older brother, Uriah Foley, and had distributed it to students at school. (Doc. 92 ¶ 9). She would then bring the money she received from the students back to Uriah, keeping

---

[1]Doc. 84-3 is Officer Sanchez's Affidavit for a Search Warrant to search A.F.'s family residence for controlled substances such as marijuana, dated December 5, 2007. Plaintiffs have made no objections to this exhibit.

none for herself.  (Doc. 92 ¶ 9; Doc. 90 ¶ F).  A.F. further admitted to having sold marijuana at

school that week.  (Doc. 92 ¶ 10).  In response to Officer Sanchez' question whether she had seen

drugs inside her home, she stated that although she had observed a pipe in her brother's room a

couple of weeks prior to the interview, she was unsure whether there was any marijuana in the home

at that time.  (Doc. 92 ¶ 11; Doc. 84-2 at 11:5-24, 12:1-4).

The interview lasted approximately nine minutes.  (Doc. 92 ¶ 17).  Although all parties agree

that both Officers Sanchez and Vasquez were in the room with A.F. throughout the course of the

interview, it is partially disputed whether Principal Lujan and a female security officer were also

present.[2]  (Doc. 92 ¶ 15).  A.F. agrees that she was not placed in restraints, that the officers did not

---

[2]In her affidavit attached to Plaintiffs' Response to Eddy County's Motion for Summary
Judgment, A.F. states that "the female security officer sat in the office with me for awhile [sic]
but I was alone with Officer Sanchez and Deputy Vasquez for most of the interview."  (Doc. 92-
2 ¶ 14).  This statement contradicts Eddy County Defendants' representation that "[t]he principal
of the school and another female were present during the interview."  (Doc. 92-2 ¶ 14).
However, in a deposition taken prior to executing her affidavit, A.F. appeared to testify that a
female security guard *and* Principal Lujan were in the room with her at various points during the
questioning:

  Q :   "And when you went down there, you were put in Caudill's office?"
  A.F.: "Yes, sir."
  Q:    "*Anybody else with you?*"
  A.F.: "I don't really remember right off.  *It was the security guard.*"
  . . .
  Q:    "Do you remember his name, or her name?"
  A.F.: "Anna Garcia."
  Q:    "*Okay. Anybody else down there*?"
  A.F.  "*Well, they like switch, sir, so.*"

(Doc. 84-1, Deposition of A.F. at 13:16-25, 14:1-2 (emphasis added)).

  Q:    "When they read those rights to you, did they ask you – after that, did they ask
         you some questions?"
  A.F.: "Yeah."
  . . . .
  Q:    "And why were you not truthful with them?"
  A.F.: "Because I was scared."

remove her from the school, and that she was not placed in a police car. (Doc. 92 ¶ 14). However, A.F. asserts that Defendant Officer Sanchez used an intimidating, "almost forceful" tone during the course of the interview. (Doc. 92 ¶ 16). She further contends that notwithstanding her statement to the officers that she understood her Juvenile Miranda rights, in reality she did not understand her rights and only said otherwise because she was scared. (Doc. 90 ¶ D). She also states she felt she was being threatened by Officer Sanchez when she tried to tell the truth – that she had done nothing wrong – and that her statements pertaining to the drug distribution were not truthful. (Doc. 92 ¶ 12). At this point, A.F. maintains that she never transferred nor carried marijuana from her brother to students at Alta Vista. (Doc. 92-5 at 23:16-22).

Following the interview with A.F., Defendant Officer Sanchez traveled to A.F.'s family residence in Carlsbad, New Mexico, where Plaintiff Uriah Foley also lived. (Doc. 90 ¶ H). Sanchez arrived at the residence at approximately the same time Plaintiffs Nancy Gomez and Uriah Foley were pulling up in their vehicle. (Doc. 90 ¶ I). It does not appear that Nancy and Uriah were aware of A.F.'s interrogation when they arrived at their home. Although Nancy had been called to A.F.'s

---

Q:      "Okay."
A.F.:   "I had never been in any trouble, sir."
Q:      "What made you scared?"
A.F.:   "Them."
Q:      "*Who was present with you?*"
A.F.:   "*I can't remember right off, sir.  It was Mr. Lujan.*"
Q:      "*For the record, who is Mr. Lujan?*"
A.F:    "*The principal.*"

(Doc. 84-1, Deposition of A.F. at 15:9-14; 16:4-18 (emphasis added)).

Thus, A.F.'s deposition testimony indicates that a female security officer was present with her at the beginning at the interview, that this officer may have later "switch[ed] off" with someone else, and that Principal Lujan was in fact present with her during at least some portion of the questioning.

school earlier that day, and had in fact traveled to the school with Uriah[3], her deposition testimony states that when she went to the main office, a school official informed her that Principal Lujan would "be a while" and that if she had other things to do she should feel free to leave and to call the school later. (Doc. 90-8 at 14:15-25, 15:1). Nancy responded that she had just picked up her son (Uriah) from college, and that she would drop him off and return to the school afterward. (Doc. 90-8 at 16:2-5). Nancy's testimony therefore suggests that at the time she and Uriah arrived at their home, neither was aware that A.F. had been questioned regarding the alleged drug dealing or that Uriah had likewise been implicated.

Upon making initial contact with Nancy and Uriah, Officer Sanchez identified himself as a law enforcement officer and informed Nancy that she was free to leave at any time. (Doc. 90 ¶ I). Here again, the parties' account of the facts slightly diverge. The Carlsbad Defendants state that after Officer Sanchez arrived at the residence and made contact with Nancy Gomez and Uriah Foley, he administered Uriah his Miranda Rights and asked whether Uriah possessed or sold drugs. (Doc. 82 ¶ J). According to the Carlsbad Defendants, Uriah denied having or selling drugs. (Doc. 82 ¶ J). Although Uriah does not deny that Officer Sanchez asked him these questions, he states that he does not recall ever being administered his Miranda Rights. (Doc. 90 ¶ J). Carlsbad Defendants next allege that Officer Sanchez "could not obtain appropriate authority from Plaintiff Gomez to search the residence," and so secured the residence while he waited for agents of the Pecos Valley Drug Task Force to obtain a warrant to search the home. (Doc. 82 ¶ L). Plaintiffs, however, state that Officer Sanchez never asked for permission to search the property. Instead, he immediately asserted he was "seizing" the property because he was in the process of obtaining a warrant. (Doc.

---

[3]Uriah testifed that he stayed in the vehicle while Nancy went inside the school. (Doc. 82-4 at 41:17-25, 42:1-2).

90 ¶ L; Doc. 92 ¶ B(1)).  The parties agree, however, that as part of securing the residence, Officer

Sanchez did not permit anyone to enter the home, nor did he attempt the enter the residence himself.

(Doc. 90 ¶ L).  The parties also agree that the residence was unoccupied at the time of the alleged

seizure. (Doc. 90 ¶ K).  The Carlsbad Defendants state that Officer Sanchez reasonably believed

these actions were necessary in order to prevent Plaintiffs from entering the home and destroying

potential evidence.  (Doc. 82 ¶ L).

    The process of obtaining a search warrant took approximately four hours.  (Doc. 90 ¶ N).

During this time, greater numbers of officers arrived, as well as friends and relatives of the Foley

family.  (Doc. 90 ¶ M).  One of the relatives to arrive was Robert Jacquez, Uriah Foley's uncle and

the fourth Plaintiff in this matter.  (Doc. 90 ¶ M).  At one point during the four hours, Plaintiffs state

that Uriah Foley walked toward his car to retrieve a soda he had left on top of the vehicle.  (Doc. 90

¶ O).  As Uriah walked forward, Plaintiffs allege that several Defendant officers began taunting

Uriah with phrases such as "What's up punk?" and "Wanna wrestle?"  (Doc. 90 ¶).  Plaintiff Robert

Jacquez states that he became agitated upon witnessing these events, and in an attempt to protect his

nephew called the officers a "bunch of pussies" and told them to "pick on someone [their] own age."

(Doc. 90 ¶ O).  Defendants allege that during this exchange, Defendant Officer Sanchez twice told

Plaintiff Jacquez to "step back," but that Jacquez refused to do so.  (Doc. 90 ¶ P).  Plaintiffs, by

contrast, state that Jacquez fully complied with the orders to step back. (Doc. 90 ¶ P).  Plaintiffs also

state that it was a different officer – not Officer Sanchez – who directed Jacquez to step back, that

multiple officers were taunting Uriah in an apparent attempt to provoke him, that Officers Cisneros

and Gonzales were harassing both Uriah Foley and Robert Jacquez, and that Officer Gonzales

smelled of alcohol.  (Doc. 90 ¶ P).  The officers placed Jacquez under arrest for "Resisting,

Obstructing, Evading [an] Officer." (Doc. 90 ¶ P).  Jacquez was held at the Eddy County Detention Center for approximately four hours before he was bonded out, and the charges against him were eventually dismissed.  (Doc. 90 ¶ Q).

On February 22, 2010, Plaintiffs William Lynn Foley, on his own behalf and as father and next friend of A.F., a minor, Nancy Gomez, on her own behalf and as mother and next friend of A.F., a minor, Uriah Foley, and Robert Jacquez filed a First Amended Complaint for Civil Rights Violations alleging seven counts of wrongdoing against sixteen Defendants and seeking monetary damages under 42 U.S.C. § 1983.  Plaintiffs charge Defendants with Interrogation of A.F., a Child (Count I); Unlawful Interference with Possession of Residence (Count II); Wrongful Arrest of Plaintiff Jacquez (Count III); Refusal to Leave the Residence When Requested (Count IV); Failure and Refusal to Return Seized Property (Count V); Punitive Damages (Count VI); and Organizational Policy (Defendants Carlsbad Municipal Schools, City of Carlsbad and County of Eddy) (Count VII).

On July 13, 2010, Defendants Carlsbad Municipal Schools, Superintendent Ron Owen, and Assistant Principal Miles Caddell  filed a motion to dismiss the claims against them (doc. 13.), which this Court granted in part and denied in part on January 24, 2011.  (Doc. 50)  Now, remaining defendants Allen Sanchez, Tony Cisneros, and the City of Carlsbad ("Carlsbad Defendants"), as well as Eddy County, the Eddy County Sheriff's Department, the Pecos Valley Drug Task Force, Daniel Vasquez, Commander David Edmundson, Lt. Carroll Caudill, Captain Leon Newman, Sgt. Michael Chavarria, Phillip Wall, and Daniel Gonzales ("Eddy County Defendants") move for Summary Judgment on each of Plaintiffs' claims and assert qualified immunity with respect to those Defendants named in their individual capacity.

## II.    STANDARD

### A.    Summary Judgment

Summary judgment is appropriate where the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. PROC. 56(a).  "A fact is 'material' if under the substantive law it could have an effect on the outcome of the lawsuit.  An issue is 'genuine' if 'a rational jur[or] could find in favor of the nonmoving party on the evidence presented.' " *Adams v. Am. Guarantee and Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir.1998).  "A party asserting that a fact is genuinely disputed must support this assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials." FED. R. CIV. PROC.56(c)(1)(A).  If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion.  FED. R. CIV. PROC. 56(e) & 56(e)(2).

The movant – in this case, the Defendants – carries the initial burden of showing that no genuine issue of material fact exists.  *Id.* at 1246; *Adler*, 144 F.3d at 670.  This burden may be discharged by showing there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the movant meets this initial burden, the burden then shifts to the non-moving party – here, the Plaintiffs – to find sufficient evidence that would warrant submission of the case to a trier of fact.  *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992).  "Evidence is sufficient to withstand summary judgment if it is significantly probative and would enable a trier of fact to find in the nonmovant's favor."

*Adams*, 233 F.3d at 1246.  In making this determination, the trial court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the non-moving party." *Simms v. Oklahoma ex rel. Dept's of Mental Health & Substance Abuse Serv.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

     **B.**     **Qualified Immunity**

     Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established  statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Whether defendants are entitled to qualified immunity is a question of law.  *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007).  Where a defendant asserts qualified immunity at the summary judgment stage, "the plaintiff bears a heavy two-part burden."  *Id.*  First, Plaintiffs must show that Defendants' actions violated a specific constitutional or statutory right.  *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004).  Second, Plaintiffs must demonstrate that the right was clearly established prior to the challenged official action.[4]  *Id.*  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (citing *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir.2001).  This requirement is designed to protect "all but the plainly incompetent or those who knowingly violate the law."  *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).  In the Tenth Circuit, plaintiffs may satisfy their

---

     [4]Courts are not required to address these prongs in this specific order; rather, they are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 129 S.Ct. 808, 818 (2009).

burden of demonstrating a right is "clearly established" either by pointing to the existence of a Supreme Court or Tenth Circuit opinion on point, or by showing that their proposition is supported by the weight of authority from other courts.  *Herring v. Keenan*, 218 F.3d 1171, 1176 (10th Cir. 2000).

## III.    ANALYSIS

As noted above, the City of Carlsbad Defendants and the Eddy County Defendants filed separate motions for summary judgment.  However, because Plaintiffs' claims stem from a single set of events, largely fail to differentiate between defendants, and are treated substantially the same by both sets of defendants, the Court will analyze the merits of these claims with respect to all parties.

### A.    Count I: Interrogation of A.F., a Child

In Count I, Plaintiffs contend that the officers' interrogation of A.F. violated her constitutional rights.   In making this charge, however, Plaintiffs fail to specify precisely which rights Defendants violated.  As noted in this Court's prior Memorandum Opinion and Order (doc. 50), Plaintiffs' original factual allegations *appear* to implicate A.F.'s Fourth Amendment right to be free from unreasonable searches and seizures, A.F.'s Fifth Amendment right against self-incrimination, and A.F.'s Fourteenth Amendment substantive due process right to be free from coercive questioning.[5]   Now, in addition to those theories of liability, Plaintiffs' briefing on Defendants' Motions for Summary Judgment suggests Defendants also violated Nancy Gomez' and William Foley's Fourteenth Amendment substantive due process right to the management and

---

[5]Plaintiffs' First Amended Complaint also alleges facts supporting a violation of A.F.'s Fourteenth Amendment guarantee to equal protection of the laws. However, Plaintiffs appear to have abandoned this claim at summary judgment based on developments in the record.

custody of their child, A.F., as well as A.F.'s Fourteenth Amendment guarantee of procedural due process in her confinement and interrogation.

Plaintiffs have failed to demonstrate any genuine issue of material fact precluding summary judgment in favor of Defendants on any of these theories. Thus, Count I is dismissed in its entirety.

(a)    *Fourth Amendment Claim for Unreasonable Seizure*

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. Plaintiffs do not assert A.F. was searched as part of the interrogation, therefore the Court will limit its discussion to whether the events complained of constituted an unreasonable seizure. Normally, the first step of this analysis is to determine whether a "seizure" actually occurred for Fourth Amendment purposes.[6] *Couture v. Bd. of Edu. of the Albuquerque Pub. Sch.*, 535 F.3d 1243, 1250 (10th Cir. 2008). Here, however, the Court finds that even if the officers "seized" A.F. within the meaning of the Fourth Amendment, this seizure was reasonable under the circumstances. It will therefore assume *arguendo* that the officers' actions constituted a seizure and will proceed immediately to the final, "reasonableness" step of the inquiry.

Whether a seizure is reasonable depends on the context in which it took place. *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). Although a valid seizure generally must be supported by either a warrant or probable cause, the Supreme Court has recognized limited, context-specific exceptions in which a lesser standard is appropriate. *Jones v.*

---

[6]Courts will generally find a seizure to have occurred where a reasonable person would have believed that she was not free to leave. *Couture v. Bd. of Edu. of the Albuquerque Public Schools*, 535 F.3d 1243, 1250 (10th Cir. 2008) (citing *Michigan v. Chestnut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).

*Hunt*, 410 F.3d 1221, 1227-28 (10th Cir. 2005). The parties' briefing raises two potentially relevant exceptions. However, the Court finds it unnecessary to apply either exception in the instant case because A.F.'s seizure was supported by probable cause. Thus, although the Court will briefly address the parties' arguments, its treatment of these alternative standards will be limited.

The first exception, noted by the City of Carlsbad Defendants in their Motion for Summary Judgment (doc. 82 at 8), was established in the Supreme Court decision *New Jersey v. T.L.O.* In *T.L.O.*, the Supreme Court found that special considerations present in the public school context may justify a departure from the normal probable cause standard in assessing the constitutionality of a warrantless search. *T.L.O.*, 469 U.S. at 341. Balancing schools' interest in protecting students' welfare against individual privacy rights, the Court found that a school official's decision to search a student need only be based on reasonable suspicion – not probable cause – that the search would result in evidence showing the student violated the law or school rules. *Id.* at 341-42. The Tenth Circuit has since interpreted the Court's holding to apply to seizures as well as searches. *Edwards v. Reese*, 883 F.3d 882, 884 (10th Cir. 1989). However, in its opinion the Supreme Court expressly limited its holding to those "searches carried out by school authorities acting alone and on their own authority," withholding judgment on the "appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies." *T.L.O.*, 469 U.S. at 341 & n.7. This case arguably falls outside the specific exception to probable cause articulated in *T.L.O.* because the seizure was conducted by law enforcement officers in

conjunction with school officials and appeared to be at the behest of a law enforcement agency.[7] [8]

The second relevant exception, raised by the Eddy County Defendants in their separate Motion for Summary Judgment, applies to police-citizen encounters that do not rise to the level of an arrest.  In *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court found that "investigative detentions[, or "*Terry* stops,"] which are Fourth Amendment seizures of limited scope and duration," must be supported only by a "reasonable suspicion of criminal activity."  *United States v. White*, 584 F.3d 935, 944 (10th Cir. 2009).  "An arrest is distinguished from an investigative *Terry* stop by the involuntary, highly intrusive nature of the encounter."  *Id.* at 952 (quotation omitted).  Whether an encounter is more aptly described as an investigative detention or an arrest depends on the totality of the circumstances, including factors such as the duration of the detention, the number of detainees vis-a-vis the number of officers, environmental conditions, time of day, and whether handcuffs or weapons were employed. *See, e.g.*, *Davis v. City*

---

[7]The parties agree that Officers Sanchez and Cisneros traveled to Alta Vista upon receiving a "tip" that a student at the school had offered to sell drugs to another student.  The record suggests that this tip came directly from a student at the school, rather than from school authorities.  (Doc. 84-3 at 3, Attachment C to Officer Sanchez' affidavit for a warrant to search A.F.'s residence) (the agents "responded to [Alta Vista] in reference to information received from a student, who wished to remain anonymous, that a student at this school had offered to sell them any kind of drug the student wanted.  This student identified the person that had offered them drugs as [L.M.]).  Thus, the Court is presented with a situation where, on the one hand, the seizure occurred on school property, was for the purpose of investigating possible illegal drug distribution at school, and was conducted with the approval of school authorities.  On the other hand, the seizure was arguably initiated by law enforcement officers, the officers conducted all of the questioning, and Officer Sanchez ultimately used A.F.'s statements as a basis to obtain a warrant to search her family residence.

[8]This Court's prior Memorandum Opinion and Order (doc. 50), granting in part and denying in part the School Defendants' Motion to Dismiss, applied the *T.L.O.* reasonableness standard based on the record before it at the time including Plaintiffs' First Amended Complaint and the parties' briefing on the issues.  Analysis of the School Defendants' conduct based on the more stringent probable cause standard, as discussed today, would not have altered the outcome.

*of Aurora*, 705 F. Supp. 2d 1243, 1258 (D. Colo. 2010) (citing cases).  The question whether to categorize a police-citizen encounter as an arrest or investigative detention is significant because it determines which Fourth Amendment reasonableness standard governs its constitutionality.

In this case, however, it unnecessary for the Court to decide which standard applies because the officers' conduct was justified even under the more stringent dictates of probable cause. "Probable cause exists where 'the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)).  In determining whether probable cause exists, courts "evaluate[ ] . . . the circumstances as they would have appeared to prudent, cautious and trained police officers." *United States v. Davis*, 197 F.3d 1048, 1051 (10th Cir.1999) (quotation omitted).  "Whether a reasonable officer would believe that there was probable cause to arrest in a given situation is based on the totality of the circumstances."  *Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir. 2011).

At the time of the seizure, the officers possessed reasonably trustworthy information to warrant a belief that A.F. was involved in the criminal distribution of marijuana to Alta Vista students.  Prior to interrogating A.F., the officers had received a tip that a student at Alta Vista had offered to sell drugs to another student.  Upon traveling to the school, the officers spoke individually with two students prior to questioning A.F. – first with L.M., and then with E.M.  Both students, whom the officers interviewed separately, told officers that A.F. was the source of the marijuana. L.M. communicated this information based on firsthand knowledge.  E.M. then corroborated L.M.'s

14

statement that L.M. had sold him marijuana that morning. Both students admitted to their own involvement in buying or selling the illegal drug. Plaintiffs offer no evidence that these statements were inherently incredible or that they failed to provide a reasonable basis for questioning A.F. Based on these statements, a reasonable officer would have believed probable cause existed to detain A.F. for interrogation.

Because Plaintiffs cannot establish that the officers' seizure of A.F. was unreasonable under the circumstances, their claim for illegal seizure in violation of the Fourth Amendment must be dismissed.

(b)     *Fifth Amendment Right Against Self-Incrimination*

As discussed in this Court's prior Memorandum Opinion and Order (doc. 50), although Plaintiffs do not specifically allege a Fifth Amendment violation, the First Amended Complaint appears to assert that the interrogation was unconstitutional because A.F. was coerced into making incriminating statements that were later used against her.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." CONST. AMEND. V. In this case, A.F.'s statements were never used against her at trial; rather, they provided a basis to secure an arrest warrant and file juvenile charges, all of which were subsequently dismissed. (First Am. Compl. ¶¶ 57, 67). There are no pending criminal proceedings wherein a party could seek to admit A.F.'s statements as evidence against her. Thus, based on the text of the Fifth Amendment, it is unclear how Plaintiffs can allege a violation of this right given that A.F. "was never prosecuted for a crime, let alone compelled to be a witness against [her]self in a criminal case." *Chavez v. Martinez*, 538 U.S. 760, 766, 123 S.Ct. 1994, 2000 (2003). This does not imply that police have free rein to torture or inflict physical abuse

15

during an interrogation as long as no statements are used at trial; it only "means that the Fourteenth Amendment's Due Process Clause, rather than the Fifth Amendment's Self-Incrimination Clause, would govern the inquiry in those cases and provide relief in appropriate circumstances." *Id*. at 773. Accordingly, the Court will proceed to evaluating Plaintiffs' claims under the Due Process Clause of the Fourteenth Amendment.

(c)    <em>Due Process Clause of the Fourteenth Amendment</em>

The Due Process Clause of the Fourteenth Amendment provides that no person shall be deprived of life, liberty, or property without due process of law. CONST. AMEND. XIV. The clause contains both a substantive and a procedural component, *Greene v. Barrett*, 174 F.3d 1136, 1140 n.1 (10th Cir. 1999), both of which Plaintiffs contend were violated by the officers' conduct. The Court will address each in turn.

Plaintiffs allege two violations of their substantive due process rights: (1) the officers' questioning of A.F. was so coercive as to be violative of the Fourteenth Amendment, and (2) the officers' questioning of A.F. violated William Foley's and Nancy Gomez's fundamental liberty interest in the care, custody and management of their child, A.F.

Plaintiffs have failed to show the officers' interrogation was so coercive as to violate A.F.'s substantive due process rights. While due process does protect against interrogation "methods that are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience,'" *Chavez*, 538 U.S. at 774 (quotations omitted), Plaintiffs cannot point to any issue of material fact that would support the existence of such a claim here. In determining whether the conduct was "conscience shocking," the critical question is whether the "interrogation techniques . . . [were] so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109, 106

16

S.Ct. 445, 88 L.Ed.2d 405 (1985). "This standard is met in only the most extreme circumstances, typically involving some violation of physical liberty or personal physical integrity." *Becker v. Kroll*, 494 F.3d 904, 923 (10th Cir. 2007).

Plaintiffs' allegations fail to meet this exacting standard. In fact, the only allegations pertaining to the coercive nature of the questioning are as follows: (1) A.F. "was scared and felt intimidated by the officers and the tone that was being used," (Affidavit of A.F., doc. 92-2 ¶¶ 8, 11); and (2) "Officer Sanchez would raise his voice and would get really close to my face when he was asking me questions. I felt threatened when he would say that if I didn't tell them the truth he would take me to a really bad place." (Affidavit of A.F., doc. 92-2 ¶ 15).

Even accepting these statements as true, A.F.'s description of the interrogation cannot be characterized as conscience-shocking. Official conduct "most likely to rise to the conscience-shocking level" is "conduct intended to injure in some way unjustifiable by any government interest." *Id.* at 775. There is no evidence that Officer Sanchez intended to harm A.F. with his statements or conduct. It is undisputed that the interrogation lasted approximately nine minutes, that the officers did not threaten A.F. with physical violence, and that they did not physically restrain her or remove her from the school. The questioning took place in the morning and on school grounds. That the school did not contact A.F.'s parents beforehand is not dispositive, particularly given that the Constitution "does not impose a duty a parental notification" before a pupil's detainment and questioning. *Wofford v. Evans*, 390 F.3d 318, 325 (4th Cir. 2004). Moreover, the need to investigate whether A.F. had been distributing marijuana to her classmates constituted a justifiable government interest in the interrogation, as "[d]eterring drug use by our Nation's schoolchildren is at least as important as enhancing efficient enforcement of the Nation's

laws against the importation of drugs . . . ."  *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 661, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).  Thus, Plaintiffs cannot show a violation of A.F.'s substantive due process right to be free of excessively coercive interrogation.

Plaintiffs next argue that Defendants violated Nancy Gomez's and William Foley's substantive due process rights to the management and custody of their child, A.F.  They note that the Supreme Court has explicitly recognized parents' fundamental liberty interest in the care, custody and management of their children, *Santosky v. Kramer*, 455 U.S. 745, 753 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and cite a litany of cases in support of this interest.  However, the cases Plaintiff cites are largely inapplicable to the facts at hand because they contemplate parents' deprivation of broad custodial rights over their children – not temporary detentions at school.  These cases cannot be read to establish some "parental stake in a child's freedom" from such detentions. *Wofford*, 390 F.3d at 325.  Plaintiffs offer no authority supporting the proposition that parents' substantive due process rights are implicated in these circumstances.  At all times during questioning, A.F. remained on school property, under the control of school administrators.  As noted above, the Constitution imposes no duty of parental notification before a student's disciplinary detainment while at school – a conclusion "strengthened by the absence of parental notification from the Supreme Court's discussion of students' due process rights" in its jurisprudence.[9] *Id.* (discussing

---

[9]In their First Amended Complaint, Plaintiffs also allege that Defendants violated a New Mexico law establishing a presumption that confessions obtained from children aged 13 or 14 without parental presence and consent to questioning are inadmissible against the child. However, all charges against A.F. were dropped.  Therefore, the admissibility of her confession is irrelevant.  Further, in a § 1983 action, the Plaintiff must allege the deprivation by a defendant of a "right, privilege, or immunity secured by the *constitution and laws of the United States* while the defendant was acting under color of state law."  *Hill v. Ibarra*, 954 F.2d 1516, 1520 (10th Cir. 1992).  Violations of state law standing alone cannot form the basis for a claim under § 1983.

18

*Goss v. Lopez*, 419 U.S. 565, 582, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)).  Thus, Plaintiffs fail to show a violation of William Foley's and Nancy Gomez's substantive due process right to the management and custody of their child.

In regard to the procedural component of due process, Plaintiffs argue that "children have a limited liberty interest independent of their parents"; that "procedural due process must accompany a child's confinement"; and that A.F. was afforded "[a]bsolutely no procedural safeguards."  (Doc. 92 at 12).  However, as was the case with Plaintiffs' substantive due process claim, the authority Plaintiffs cite in support of their argument has little bearing on the facts at hand.  Both cases cited by Plaintiffs – *Schall v. Martin*, 467 U.S. 253, 263, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), and *Parham v. J.R.*, 442 U.S. 584, 600, 99. S.Ct. 2493, 61 L.Ed.2d 101 (1979) – addressed significant curtailments on juveniles' liberty, including the pretrial detention of a juvenile and a minor's commitment to a mental hospital, respectively.  Neither has particular relevance to a nine-minute interrogation of a child on school grounds.  Although "deprivations of liberty in the school context may implicate both procedural and substantive due process liberty interests," it is established that these rights are often " circumscribed by the need for effective and often immediate action by school officials to maintain order and discipline." *Hassan v. Lubbock Indep. Sch. Dist*, 55 F.3d 1075, 1080-81 (5th Cir. 1995).  When a child is "temporarily removed from the classroom, any loss of a property right is *de minimis* and not subject to procedural protections." *Couture v. Bd. of Educ. of Albuquerque Pub. Sch*., 535 F.3d 1243, 1257 (10th Cir. 2008); *see also Hassan*, 55 F.3d at 1081 ("*De minimis* or trivial deprivations of liberty in the course of the disciplining of a student do not implicate procedural due process requirements.")

Furthermore, the Tenth Circuit has noted that "the *Fourth* Amendment protects a person's

liberty interests under the constitution by ensuring that any arrest or physical incarceration attendant to a criminal prosecution is reasonable . . . . [T]he more general procedural and substantive due process considerations of the Fourteenth Amendment are not a fallback to protect interests more specifically addressed by the Fourth Amendment in this context." *Turner v. Houseman*, 268 Fed. App'x 785, 789 (10th Cir. 2008) (emphasis added). Although "at some point in the prosecutorial process, due process concerns can be sufficient to support a claim under § 1983," *Becker v. Kroll*, 494 F.3d 904, 920 (10th Cir. 2004), Plaintiffs cite no authority recognizing a procedural due process violation in police officers' temporary detention of a child at school.

Plaintiffs therefore fail to show that Defendants violated A.F.'s, Nancy Gomez', or William Foley's Fourteenth Amendment procedural or substantive due process rights. Neither can they establish violations of any other constitutional protections discussed under Count I. Count I is therefore dismissed in its entirety.

### B. Count II: Unlawful Interference with Possession of Residence, and Count IV: Refusal to Leave the Residence When Requested

In Counts II and IV, Plaintiffs allege that Defendants unlawfully "seized" their residence in the four hours they prevented Plaintiffs from entering their home while Defendants secured a search warrant. Plaintiffs allege that during these four hours, Defendant Sanchez shouted and cursed at them, prohibited them from entering their residence, told them he was "seizing" the property because he was "going to get a warrant," and that a group of officers "prominently display[ed] themselves at the front of the residence, patrolling its environs, and actively prevented the Plaintiffs from accessing the[] residence." (Doc. 2 ¶¶ 79, 81, 83). Plaintiffs further allege that William Foley, owner of the property, "unequivocally told Defendant Edmundson, [the agent in charge,] . . . to leave the property until such time as a search warrant was obtained." (Doc. 2 ¶¶ 94, 99). According

to Plaintiffs, Edmundson "flatly refused to leave."  (Doc. 2 ¶¶ 95, 100).

Based on these facts, Plaintiffs argue that Defendants violated their Fourth Amendment right against unreasonable seizure, citing numerous cases in support of their claim.  The cases Plaintiffs cite, however, largely address the constitutionality of warrantless searches *inside* the home; they do not shed light on the situation where, as here, law enforcement agents actively prevent the occupants of a home from entering the premises while they obtain a search warrant.  It is undisputed that the officers themselves did not enter the home until they secured a warrant.

This situation is more appropriately analyzed under the Supreme Court case *Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 939 (2001) and its progeny, which directly addressed the constitutionality of warrantless home seizures during procurement of a warrant.  In *McArthur*, law enforcement officers had been informed by the plaintiff's wife that there were drugs inside their shared home.  *McArthur*, 531 U.S. at 329. When they asked the plaintiff for permission to search the residence, the plaintiff, who was standing outside on the porch at the time, refused. *Id.*  The officers then instructed the plaintiff that he was not permitted to reenter his home until they obtained a search warrant.  *Id.*  The officers secured the warrant approximately two hours later, searched the home, and discovered marijuana. *Id*.

The Court analyzed the constitutionality of the officers' conduct under the Fourth Amendment's reasonableness prescription, balancing the homeowner's individual privacy interests against law enforcement-related concerns.  In finding that the seizure was reasonable, the Court noted that (1) the police had probable cause to believe marijuana was in the home, (2) the officers had good reason to fear that, unless restrained, the plaintiff would have reentered the home and destroyed the drugs before they could return with a warrant, (3) the police made reasonable efforts

21

to reconcile their law enforcement needs with the demands of personal privacy by neither searching the home nor arresting the plaintiff before obtaining a warrant, and (4) the restriction lasted only two hours, which was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant. *Id.* at 332-33. Subsequent courts have found longer periods of detainment likewise to be reasonable. *See, e.g.*, *United States v. Cantu*, 405 F.3d 1173 (10th Cir. 2005) (finding that detention for two-and-one-half hours while police obtained a warrant to search the plaintiff's vehicle was reasonable); *United States v. Legette*, 260 F. App'x 247, 251 (11th Cir. 2008) (holding that a four hour detention while police attempted to obtain a search warrant was reasonable); *United States v. Holzman*, 871 F.2d 1496 (9th Cir. 1989), *overruled on other grounds by Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (finding that a 13 hour seizure of a hotel room, commencing at midnight and ending at 1:00pm the next day, was reasonable under the circumstances).

In light of this authority, the Court finds that the officers' detention of Plaintiffs' home for four hours while they obtained a search warrant was reasonable. First, based on their interviews with Alta Vista students, including A.F. herself, the officers had probable cause to believe there may have been marijuana inside the home. A.F. explicitly told Officers Sanchez and Cisneros that on more than one occasion, she had received marijuana from her older brother, Uriah Foley, and had distributed it to Alta Vista students. She further admitted to having sold marijuana at school that very week. In addition, she told officers that although she was unsure whether there was any marijuana in her home at that time, she had observed a pipe in her brother's room a couple weeks prior. As discussed above, "[p]robable cause exists where 'the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in

22

themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)).  Based on the information provided by A.F., the officers reasonably believed they might find evidence of illegal drug distribution, namely, marijuana, at A.F. and Uriah Foley's shared residence.  The officers did eventually secure a warrant based on these facts, and Plaintiffs make no challenge to that warrant's validity.

Second, the officers had reason to fear that Plaintiffs, were they permitted to enter the home, might destroy evidence of illegal drugs before the officers were able to obtain a warrant.  Although it appears that neither Nancy Gomez nor Uriah Foley were aware of A.F.'s interrogation when they first arrived at the residence, Plaintiffs do not deny Officer Sanchez asked Uriah whether he possessed or sold illegal drugs upon making initial contact.  Uriah therefore would have been on notice of the officers' intention to search the premises for illegal narcotics.  Further, even if Nancy and Uriah were entirely unaware of the officers' goal in the search, it was not unreasonable for the officers to fear that Uriah – observing officers on his doorstep and knowing his home was imminently to be searched – would destroy evidence of any and all illegal activity on the premises.  Common sense dictates that a lack of clarity as to the officers' exact objective would not inhibit the impulse to destroy potentially damaging evidence against oneself.

In arguing against Defendants' summary judgment motions, Plaintiffs state that there was no basis for the officers' fear that evidence would be destroyed except for the "disputed statements attributed to [A.F.]" (Doc. 92 at 14).  Plaintiffs fail, however, to explain how these statements were "disputed" at the time of the seizure.  Although A.F. now testifies that she lied to the officers during

the questioning, and that neither she nor her brother ever participated in any illegal drug distribution, at the time of the seizure the officers had no reason to suspect A.F.'s statements were untruthful. At the outset of the interview, the officers instructed A.F. that she must be honest in her responses to their questions. (Doc. 82-3 at 3: 10-15, 20-23). A.F. stated that she understood. (Id.) Nothing in the record suggests the officers acted unreasonably in relying on A.F.'s remarks. Plaintiffs' characterization of A.F.'s statements as "disputed" therefore lacks grounding in the facts.

Third, the officers made reasonable efforts to reconcile their need to search the home with Plaintiffs' demands of personal privacy. The officers made no arrests based on their suspicion of illegal drug distribution while they were obtaining the warrant, nor did they enter the home themselves until a warrant was secured.

Finally, a restriction of four hours was reasonable under the circumstances. Plaintiffs offer no facts to suggest a lack of diligence on the part of the officers or that four hours was longer than necessary to obtain a warrant. The seizure took place in daylight hours, and, as noted above, Plaintiffs do not allege that the officers forced anyone to stay near the premises. Thus, based on the totality of the circumstances, the officers' seizure of the Foley residence for a period of four hours while they secured a search warrant was reasonable under the Fourth Amendment. Counts II and IV are therefore dismissed as to all defendants.

## C. Count III: Wrongful Arrest of Plaintiff Jacquez

Plaintiffs next allege that Defendant Officers Phillip Wall and Daniel Gonzales[10] wrongfully

---

[10]In their Motion for Summary Judgement, Eddy County Defendants indicate that Plaintiffs incorrectly named one of the arresting officers, and that Deputy *Gomez* – not Gonzales – arrested Plaintiff Jacquez. (Doc. 84 at 18). According to Defendants, Deputy Wall was the assisting officer. (Id.) This factual discrepancy is irrelevant for the purposes of this motion given the Court's finding that the arresting officer, whoever he may be, had probable cause to make the arrest and therefore the count must be dismissed as to all defendants.

arrested Plaintiff Robert Jacquez.  (First Am. Compl. ¶ 87).  They argue that the determination whether the officers had probable cause to arrest Jacquez hinges on the resolution of factual disputes and the weighing of facts that only a jury can perform, and that summary judgment must be denied on this basis.  (Doc. 90 at 16).

Contrary to Plaintiffs' assertion, district courts may determine the existence of probable cause when there is no genuine issue of material fact.  *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1215 (10th Cir. 2008).  Here, adopting Plaintiffs' version of the facts and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that the officers had probable cause to arrest Jacquez and Plaintiffs therefore cannot state a constitutional violation for wrongful arrest under § 1983.

Law enforcement officers may arrest an individual without a warrant if they have probable cause to believe that person committed a crime. *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995).  "When a warrantless arrest is the subject of a § 1983 action, the defendant arresting officer is 'entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest' the plaintiff."  *Id.* (citing *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

Robert Jacquez was charged with "resisting, evading or obstructing an officer."  Under state law, in relevant part, this charge consists of "resisting or abusing any judge, magistrate or peace officer in the lawful discharge of his duties."  1978 N.M.S.A. § 30-22-1(D).  New Mexico courts have interpreted  "abuse" in this context to include "fighting words" directed at an officer.  *State v. Wade*, 100 N.M. 152, 154, 667 P.2d 459, 461 (N.M. App. 1983); *see also Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216-17 (10th Cir. 2008) ("New Mexico courts have found § 30-22-1

25

to prohibit certain speech, when that speech is abusive . . . '[A]busing' speech in § 30-22-1(D) . . . . covers only speech that can be called 'fighting' words.") (quotations omitted).  "Fighting words" are those which tend to incite an immediate breach of the peace.  *Keylon*, 535 F.3d at 1217.

Robert Jacquez's statements that the officers were "a bunch of pussies" and his instruction that they "pick on someone their own age" unarguably constituted fighting words within the meaning of § 30-22-1.  Despite Jacquez's explanation that he was protecting his nephew from the verbal taunting of police officers, Plaintiffs cite no authority providing for an exception to § 30-22-1(D) based on verbal instigation by officers.  Neither can the officers' conduct form the basis of an independent constitutional violation.  While if true, the officers' verbal harassment of Plaintiff Foley constituted inappropriate behavior unbefitting of their positions as State representatives, "[v]erbal harassment or abuse of the sort alleged in this case is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983." *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979); *see also Moore v. Morris*, 116 F. App'x 203, 205 (10th Cir. 2004) (where a prison supervisor was alleged to have verbally abused a prisoner with a racial epithet, the court found that the conduct, though "inexcusable and offensive," "does not . . . amount to a constitutional violation.")

Based on the facts alleged, a reasonable officer would have believed there was probable cause to arrest Jacquez for violation of 1978 N.M.SA. § 30-22-1(D).  Thus, Count III must be dismissed.

### D.    Count V: Failure and Refusal to Return Seized Property

Plaintiffs next allege that during the officers' search of their home, officials seized a Honeywell Safe, an HP Pavillion Laptop Computer, a Dell Inspiron 1800 Laptop, a journal, and miscellaneous documents.  As of the day Plaintiffs filed their First Amended Complaint, February

22, 2010, more than two years had elapsed since the items were seized. All criminal charges had been dismissed. As of today, more than three years have passed since the officers' search of the Foley residence. None of this property has been returned. Given that no criminal charges are pending against the Plaintiffs as a result of the search, this delay in returning Plaintiffs' property strikes the Court as highly unreasonable. However, under governing law, Plaintiffs fail to make the required showing that a § 1983 action is the proper course for relief under the circumstances.

Although Plaintiffs again fail to specify which constitutional provision Defendants violated, it appears Plaintiffs are alleging an unlawful deprivation of their personal property rights in violation of the Fourteenth Amendment. In making this assessment, the Court notes that Plaintiffs do not allege the *initial* seizure of the property was unreasonable, but rather that officials' *continued* possession of the above-listed items violates their rights. *See, e.g., Snider v Lincoln Cnty. Bd. of Comm'rs*, 313 F. App'x 85, 93 (10th Cir. 2008) (in cases involving both the seizure and detention of personal property, Tenth Circuit courts "analyze[] the propriety of the initial seizure by police under the Fourth Amendment, . . . [and] the ultimate disposition of the property . . . [under] procedural due process.") Thus, the Court will address Plaintiffs' claim under the Fourteenth Amendment.

"The Constitution requires the Government, if it deprives people of their property, to provide due process of law . . . ." *Hudson v. Palmer*, 468 U.S. 517, 539, 104 S.Ct. 3194, 3207, 82 L.Ed.2d 393 (1984). In their motion for summary judgment, Carlsbad Defendants acknowledge that "[a] failure timely to return seized material which is without evidentiary value and which is not subject to forfeiture may state a constitutional or statutory claim." (Doc. 82 at 15) (citing *Davis v. Gracey*, 111 F.3d 1472, 1477 (10th Cir. 1997)). However, the Supreme Court has placed significant

27

limitations on when such a claim may properly be raised, finding that neither negligent nor unauthorized intentional deprivations of property by state employees can constitute a violation of procedural due process "if a meaningful post-deprivation remedy for the loss is available." *Hudson*, 468 U.S. at 533.  Thus, a state's actual "deprivation" of individual property "is not complete until and unless it provides or refuses to provide a suitable post-deprivation remedy." *Id.*  This restriction does not apply where the alleged deprivation "is not random and unauthorized, but is pursuant to an affirmatively established or de facto policy, procedure, or custom."  *Gillihan v. Shillinger*, 872 F.2d 935, 939 (10th Cir.1989); *see also Walters v. Corrections Corp. of America*, 119 F. App'x. 190, 192 (10th Cir. 2004) ("[I]n cases where the property deprivation is not random and unauthorized, 'the availability of an adequate state post-deprivation remedy is irrelevant and does not bar a § 1983 claim.' ") (quotation omitted).

Plaintiffs' claim for failure and refusal to return seized property fails on several points.  First, Plaintiffs fail to specify which defendants are responsible for the alleged deprivation of their property, instead levying this count against all defendants listed in the action.  To the extent Plaintiffs allege that any of the named individuals are responsible for the deprivation, their claim fails because Plaintiffs present no evidence that any of these individuals had the authority to return the property once it was seized.  *Snider*, 313 F. App'x at 93 (affirming district court's grant of summary judgment to defendant officers on this basis).  Neither do Plaintiffs specify whether the alleged deprivation was authorized or unauthorized, and if it was unauthorized, whether the state of New Mexico lacks adequate post-deprivation remedies.  *Hudson*, 468 U.S. at 533; see also *Wagner v. Higgins*, 754 F.2d 186, 192 (6th Cir. 1985) ("[I]n an action under 42 U.S.C. § 1983 for deprivation of property under color of law without due process, the plaintiff must prove the absence of adequate

28

state remedies as an element of the constitutional tort.")  Finally, Plaintiffs do not assert that their alleged property losses occurred pursuant to an affirmatively established or de facto policy, procedure, or custom.  Thus, there is no avenue for this Court to provide relief via § 1983 and Plaintiff's Count V must be dismissed.

#### E.   Count VI: Punitive Damages

Plaintiffs' First Amended Complaint makes clear that they seek punitive damages only as to the individually named defendants.  A punitive damages claim "is not an independent cause of action or issue separate from the balance of a plaintiff's case."   *Mason v. Texaco, Inc*., 948 F.2d 1546, 1554 (10th Cir. 1991).  Rather, " [i]t is part and parcel of a liability determination and does not have any independent being until a jury has decided, based on the preponderance of the evidence, that not only was a defendant's conduct negligent, but that it was gross, willful, wanton or malicious." *Id*.   Because Plaintiffs have failed to establish the existence of any constitutional violation on the part of any of the individually named defendants, there is no basis for a punitive damage claim.  Thus, Count VI  must be dismissed.

#### F.   Count VII: Organizational Policy

Plaintiffs have agreed to dismiss Count VII, Organizational Policy, against all defendants.

### IV.   CONCLUSION

Plaintiffs have failed to establish the existence of any genuine issue of material fact supporting the existence of a constitutional violation on the part of any named Defendant.  Plaintiffs' First Amended Complaint must therefore be dismissed in its entirety.

**WHEREFORE**,

**IT IS ORDERED** that Defendants the City of Carlsbad, Allen Sanchez and Tony Cisneros'

Motion for Summary Judgment and for Qualified Immunity (Doc. 82), and Eddy County

Defendants' Motion for Summary Judgment (Doc. 84) are **GRANTED**.


_____

**ROBERT BRACK**
**UNITED STATES DISTRICT JUDGE**